465 P.2d 372

**STATE of Arizona, Appellee,**

v.

**Jordan D. HOLMES, Appellant.**

**No. 1 CA–CR 210.**

Court of Appeals of Arizona,
Division 1,
Department A.

Feb. 25, 1970.

Rehearing Denied April 1, 1970.

Review Granted April 21, 1970.

———◆———

Gary K. Nelson, Atty. Gen., Phoenix, by Carl Waag, Sp. Asst. Atty. Gen., for appellee.

Estrada, Estrada & Ross, by Carlos R. Estrada and Lionel Estrada, Phoenix, for appellant.

STEVENS, Judge.

Jordan D. Holmes was convicted of grand theft by false pretenses. A.R.S. § 13–664 sets forth the requirements of proof. The basic issue on this appeal is the sufficiency of the evidence to satisfy the statutory proof requirements.

The information charges that Holmes:

" * * * on or about the 20th day of March, 1964, and before the filing of this information at and in the County of Maricopa, State of Arizona, did then and there knowingly and designingly by false or fraudulent representation or pretense steal from CORNELL ROSS, United States Currency of the value of more than One Hundred Dollars ($100.00); * * *." (Emphasis Theirs.)

Holmes admitted that he received $1500 in cash from Ross, the complaining witness named in the information, receiving the money on 20 March 1964. Ross testified that the $1500 was a down payment on the purchase of a No. 6 Liquor License from Holmes. Holmes contended that the money was a down payment for the remodeling of the Ross Bar, The Antlers, the completion of the contract being contingent upon Ross securing a No. 6 License from Arizona's Department of Liquor Licenses and Control, referred to herein as the Department.

### THE MOTION FOR DIRECTED VERDICT

Before discussing the evidence, we desire to dispose of the Holmes contention that it was error to deny the Holmes motion for a directed verdict at the close

of the State's case. It is noted that after the motion was denied, the defense presented evidence. The motion was not renewed at the close of all of the evidence. Under these circumstances the motion was waived. State v. Weis, 92 Ariz. 254, 375 P.2d 735 (1962); State v. Cousins, 4 Ariz. App. 318, 420 P.2d 185 (1966). The *Cousins* case was modified in other respects after the motion for rehearing. 4 Ariz. App. 468, 421 P.2d 901 (1967). Under the circumstances presented to us in connection with this appeal, the appeal is to be decided based upon the totality of the evidence presented at the trial. State v. Villegas, 101 Ariz. 465, 420 P.2d 940 (1966). Nevertheless, we have examined the evidence and find no error in the denial of the motion for directed verdict.

## LIQUOR LICENSES

At the time in question the issuance of new liquor licenses was controlled by a quota system set out by the statute. Liquor licenses were referred to by a member, based upon the statutory definition of each type of license. There were three types of retailers' licenses referred to at the trial. These were No. 6, No. 7, and No. 9. A No. 6 License was an "on-sale" license which authorized the holder of the license "to sell all spirituous liquors by individual portions and in the original containers." This license authorized the sale of all types of alcoholic beverages for consumption on the premises and also authorized the sale of all types of alcoholic beverages in their containers. A No. 7 License was also an "on-sale" license. This license authorized the holder thereof "to sell wine and beer by individual portions and in the original containers." A No. 9 License was an "off-sale" license which authorized the holder "to sell all spirituous liquors" in their containers for consumption off of the premises.

## THE EVIDENCE

Holmes having been convicted in the trial of this case in the Superior Court, we review the evidence in the light most favorable to sustaining the verdict. Had the jury agreed with the Holmes version of the transaction which he had with Ross, the jury would have rendered a verdict of not guilty. The jury, having found Holmes guilty, obviously agreed with the State's version of the evidence. The trial court denied the Holmes motion for new trial. We recognize that there were some inconsistencies in the Ross testimony as well as inconsistencies in the testimony presented on behalf of the defense.

Prior to 1961 Ross lived in Pennsylvania and was foreman for Reynolds Metals. He and his family came to Arizona in April of that year and he was again employed by Reynolds Metals. In April 1962 Ross purchased the Antlers, buying the business as well as the No. 7 License therein. On 2 December 1963 he applied to the Department for a No. 6 License.

In February 1964 Elmer King, a member of the Arizona Legislature, was a customer at the Antlers. This place of business was within King's legislative district. King learned that Ross had a pending application for a No. 6 License. At this point the testimony for the State and the testimony for the defense come into sharp conflict. Ross testified that King advised that he had a friend who was about to reacquire a No. 6 License and that the friend would sell the license for $2500 of which $1500 was required as a down payment. The friend was Holmes, also a member of the Arizona Legislature. King testified that Ross expressed confidence that the application for the No. 6 License would be successful and that Ross wanted to increase the area of his place of business. King testified that his friend, who turned out to be Holmes, was a licensed contractor and that he, King, would put Holmes and Ross in touch with each other. Holmes testified that King told him that Ross, whom he had never met, wanted Holmes to undertake the construction of the modification of the building wherein the business known as the Antlers was conducted. King later introduced Ross to Holmes. King testified that he heard little

or none of their conversation. The professional card which Holmes gave to Ross at this first meeting did not identify Holmes as a contractor but identified him as a member of the Legislature. According to the testimony, Holmes did have a contractor's license at that time. This was not disputed. During the years 1962 and 1963, Holmes was a member of a legislative committee which was working on the revision of the Liquor Laws.

Ross testified that Holmes agreed to sell him a No. 6 License which Holmes owned and was soon to be returned to him by another person. Ross testified that the statements made to him by Holmes were in substantial conformity with the information which Ross had received from King.

Ross testified that he told Holmes that Ross would have to borrow the money. Holmes first denied being so informed, but when asked whether he, Holmes, had previously stated under oath that Ross "said he would have to borrow the money" Holmes replied, "I might have said that."

In corroboration of Ross' statement that he borrowed the money, he testified as to the source of the loan, and his bank statement, which was introduced into evidence, carried a $2100 deposit on 18 March. The same statement disclosed a $1500 withdrawal on 20 March. There is no dispute that Holmes wanted cash and received 15 bills, each in the denomination of $100, on 20 March.

At the time of the transfer of the $1500 from Ross to Holmes, Holmes in his own hand gave Ross a receipt reading as follows:

"Receipt Date 3–20–1964 No. 1273
Received from Cornell Ross
address 600 W. Baseline Rd Tempe
Fifteen Hundred no/100 Dollars $1500⁰⁰
for Personal Service
And in the event the service
is not Rendered the full
amount to be returned
        By /s/ J. D. Holmes"

The receipt was taken from Holmes' receipt book. It bore headings showing various contemplated methods of payment, that is by "cash", by "check", or by "money order", and the cash heading was followed by a check mark.

There was evidence from the Department which corroborated the Ross testimony as to the issuance of the No. 7 License and as to his application for a No. 6 License. A Department employee testified as to the quota system in connection with liquor licenses. He testified in part:

"A. The reason for that is that there is a quota system which is set up by the statutes of the State of Arizona whereby only so many licenses are available in the Series 6 and 7 and 9, particularly. There are only so many available each year.

"Q. So, the quota system on 6, 7 and 9's is most prevalent?

"A. 6 and 9's are most prevalent."

The receipt as originally written did not spell out the word "hundred" using an abbreviation "hun." Ross requested that Holmes write out the word "hundred" this being approximately one month later.

Holmes introduced into evidence a form of contract for $4500 for the building modification. This contract did not bear Holmes' signature nor was it ever presented to Ross. Holmes incurred the expense of $35 for a very rough sketch of the modification of the Antlers. This sketch carried a number of longhand requests by the draftsman for further information, and Holmes made no effort to obtain further information or to again contact the draftsman.

It was brought out in the evidence that at that time Holmes did maintain a checking account and yet he testified that he kept the money in cash in his own home until late in the year 1964.

Holmes' version was that the finalizing of the contract and the procuring of the detailed information with reference to the construction was contingent upon the issuance of the No. 6 License by the Depart-

ment to Ross. Holmes testified that he did little contracting in 1964. His construction engineer, who had drafted the brief drawing, testified that in 1964 he worked on at least two jobs each of which was over $10,000 and on some smaller jobs for Holmes.

Ross withdrew his application for a No. 6 License on 16 July 1964 and moved to Klamath Falls, Oregon. This was confirmed by the records of the Department. Ross testified that he demanded the return of his money. Holmes stated that there was no demand for the return of the money and testified that Ross telephoned Holmes from Oregon stating that he wanted Holmes to hold everything.

King testified that he advised Ross that there was a No. 9 License available, and Ross denied this information. Both King and Holmes testified that at no time did Ross seek to buy a No. 6 License from Holmes. Holmes and Ross both negatived the idea that the arrangement between Ross and Holmes was one whereby Holmes was to exercise influence as a legislator.

## THE STATUTE AS TO PROOF

A.R.S. § 13–664 subsec. A is as follows:
"A. Upon a trial for having obtained the signature of a person to a written instrument or having obtained from a person money, personal property or other valuable thing, with an intent to cheat or defraud another designedly by any false pretense, defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof, is in writing, subscribed by or in the handwriting of defendant, or unless the pretense is proved by the testimony of two witnesses, or that of one witness and corroborating circumstances."

## THE RECEIPT

Holmes strenuously urged in the trial court and urges in the Court of Appeals that the case must fall for the reason that the receipt does not express the false pretense. In our opinion this is not necessary. The receipt is ambiguous. Both Ross and Holmes testified as to its meaning. In our opinion those portions of the statute which are applicable here are as follows:

"A. Upon a trial for * * * having obtained from a person money, * * * with an intent to cheat or defraud another designedly by any false pretense, defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, * * * unless the pretense is proved by the testimony * * * of one witness and corroborating circumstances."

■ We recognize that we have not recited all of the evidence nor have we recited all of the conflicts in the evidence. In our opinion the evidence sustains the statutory proof, that is "the testimony * * of one witness", the complaining witness, Ross, "and corroborating circumstances." This alternative method of proof is recognized in Maseeh v. State, 46 Ariz. 94, 47 P.2d 423 (1935). *Maseeh* also recognized that there must be a false representation as to an existing fact. In our opinion Holmes' representation that he in fact owned a No. 6 License then in the hands of another with the right of Holmes to immediately become the owner thereof, a right he was about to exercise, is a representation of an existing fact. Ross testified that on the day before the money changed hands, he received a telephone call from Holmes stating that Holmes had another person who desired to buy the No. 6 License but that Ross had the first refusal.

## IMPEACHMENT

■ Holmes objects to the evidence of Mary Hockey called as a witness on rebuttal. She was an employee of Ross at the Antlers, and she was an experienced bartender. King admitted that he was at the Antlers after the 20th of March and

after delays and inquiries had developed in connection with the failure of Ross to receive the license. He urged that he had then talked to Mary Hockey with reference to a construction contract and denied that he had ever talked to her about a liquor license. She testified in contradiction to that testimony. We hold it was proper impeachment testimony in relation to one of the main witnesses for the defense.

Without going into greater detail, we hold that viewing the evidence in the light most favorable to the State, the statutory proof by "one witness and corroborating circumstances" has been met.

Affirmed.

CAMERON, J., concurs.

DONOFRIO, Presiding Judge (specially concurring).

I differ with the majority opinion insofar as it might infer that the "corroborating circumstances" required by A.R.S. § 13–664, subsec. A apply to all elements of the crime. I believe it is only the specific element of the false pretense which must be corroborated and to which we must direct our attention.

To constitute the crime of obtaining money by a false pretense with the intent to defraud, four things must concur: (1) there must be an intent to defraud; (2) there must be an actual fraud committed; (3) false pretense or pretenses must be used for the purpose of perpetrating the fraud; and (4) there must be reliance by the victim on the offender's fraudulent representations in parting with the property. 47 Cal.Jur.2d, Theft § 50 (1959).

In the case at bar, the language of the statute clearly indicates that the fact which must be proven by corroborating circumstances where there is but one witness is the making of the false pretense, the third element, supra. Th statute does not mention the other elements and therefore the requirement of corroboration does not apply to them.

Our statute, A.R.S. § 13–664, is substantially similar to California's Cal.Pen.Code § 1110 (West 1956). California courts have said, in construing § 1110, that the only corroboration required in a prosecution for theft by false pretenses, other than with respect to the testimony of an accomplice, is with reference to the making of the pretense. People v. Beilfuss, 59 Cal. App.2d 83, 138 P.2d 332 (1943), appeal dismissed Beilfuss v. California, 321 U.S. 746, 64 S.Ct. 529, 88 L.Ed. 1048 (1944). See 47 Cal.Jur.2d, Theft § 152 (1959). On this appeal, I do not deem pertinent to the issue created by the language of the statute the evidence recited to corroborate Ross' testimony on facts other than the false representation. The instant case can be distinguished from cases of confessions. In those cases, the defendant's confession of the crime without more will not support his conviction, i. e., there must be corroborating evidence of the corpus delicti. This safeguard, peculiar to the law of confessions, is based on the premise that confessions are an unreliable type of evidence. M. Udall, Arizona Law of Evidence § 179 (1960).

Due to the inherent vulnerability of a witness's testimony regarding certain specific facts, corroboration of such testimony is required, in given situations, in order to sustain the burden of proof. Carrying this from general principle to the instant charge, it would appear that this vulnerability arises chiefly in relation to the witness's testimony as to facts surrounding the false pretense which induced the witness to part with this large sum of money. A mere misunderstanding by a complaining witness of a representation, although completely honest on such witness's part, is insufficient to support a conviction. Also, because of the frailties of human nature, a person who has lost prop-

438

erty ·may become prejudiced and may therefore easily misrepresent facts. To protect against this, the actual fact of the misrepresentation must be corroborated. Maseeh v. State, 46 Ariz. 94, 47 P.2d 423 (1935); Erickson v. State, 14 Ariz. 253, 127 P. 754 (1912).

I regard this as a close case in that there is no evidence other than from the lips of the complaining witness, Ross, of the false pretense that the defendant represented he owned or would reacquire a "No. 6" License which he was selling to Ross. Were it not for the wording of the receipt signed by the defendant that it was for "Personal service And in the event the service is not Rendered the full amount to be returned", there would not be a scintilla of evidence or corroboration as to this false representation. The ownership of the license is the fact upon which the charge is bottomed since Ross denied any implication that he was employing the defendant to use his influence as a legislator to get a "No. 6" license.

The question then becomes whether, under the evidence, it can be reasonably inferred that by use of the words "for personal service" defendant was representing that he had a license which he was selling to Ross and for which he was charging him $1500, i. e., $1500 for this "service". Whether there are corroborating circumstances is, in the first instance, a question of law and once corroborating circumstances appear, the weight to be given such evidence is for the trier of fact. 7 J. Wigmore, Evidence §§ 2056–59 (3rd ed. 1940) (dealing with uncorroborated accomplices). I will have to agree that although the receipt, standing alone, would fall far short of evidence necessary to sustain the conviction, it is sufficient, when all of the facts are considered, to raise the reasonable inference of the false pretense and therefore amounts to corroborative circumstances within the purview of A.R.S. § 13–664, subsec. A.